**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANGELINA SANCHEZ,** | : | **Civil No.  3:24-CV-00240** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **LELAND DUDEK,** | : | |
| **Acting Commissioner of Social Security[1]** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

I.    **Introduction**

Administrative Law Judges (ALJs) make disability determinations using a five-step sequential analysis which first establishes a residual functional capacity (RFC) for a claimant and then determines whether an individual with the claimant's same age, education, and RFC could perform either their past work or any work that exists in significant numbers in the national economy. ALJs use a number of tools and experts to aid in this determination, including vocational experts (VEs) whose

---

[1]Leland Dudek became the Acting Commissioner of Social Security on February 16, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for the previously named defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

testimony often informs and supports the decision of the ALJ as to whether any jobs exist which the claimant could perform. Indeed, "vocational expert testimony may provide substantial evidence to support an ALJ's finding at Step 5." Evans v. Kijakazi, No. 1:21-CV-00554, 2023 WL 2761125, at *8 (M.D. Pa. Apr. 3, 2023) (citing Zirnsak v. Colvin, 777 F.3d 607, 616 (3d Cir. 2014) ("The Commissioner can also rely on testimony from a VE to meet its step-five evidentiary burden")). But it is also axiomatic that an ALJ must address and resolve any material ambiguities and inconsistencies between vocational expert testimony, the Dictionary of Occupational Titles (DOT), the reference work upon which the expert relies upon when rendering an opinion, and the ALJ's decision, or remand may be appropriate. See Boone v. Barnhart, 353 F.3d 203, 209 (3d Cir. 2003); Smith v. Astrue, 961 F. Supp. 2d 620, 658 (D. Del. 2013); Williams v. Barnhart, 424 F. Supp. 2d 796, 802 (E.D. Pa. 2006).

So it is here. In the instant case, the ALJ based her decision that the plaintiff, Angelina Sanchez, was not disabled upon the flawed and fatally ambiguous testimony of the vocational expert which seemingly never concluded that a plaintiff with both the plaintiff's mental and physical RFC could perform all three jobs referenced by the ALJ in the decision. Moreover, two of the occupations identified by the ALJ clearly conflict with the RFC, which limits Sanchez to no fast-paced production work, since they are assembly line occupations which are definitionally

fast-paced production rate work. In our view, the ALJ's failure to address these ambiguities and inconsistencies results in a decision which cannot be sustained when viewed pragmatically in light of economic realities. Accordingly, for the reasons set forth below, we will remand this case for further consideration by the Commissioner.

## II.    Statement of Facts and of the Case

On August 11, 2020, Angelina Sanchez filed an application for a period of disability insurance benefits, alleging disability beginning March 15, 2020.[2] (Tr. 17). Sanchez alleged that she was disabled due to the combined effects of the following physical and emotional impairments: fibromyalgia, degenerative joint disease, chronic pain, depression, anxiety, chronic back pain, sciatica, fatigue, insomnia, chronic headaches, and thrombotic thrombocytopenic purpura. (Tr. 87). Sanchez was born on February 22, 1978, and was thirty-eight years old, which is defined as a younger individual under the Social Security guidelines, on the alleged disability onset date. (Tr. 53). She had a limited education, having left school in eighth grade. (Id.)

Sanchez alleges limitations in her ability to perform work-related activity based upon both her physical impairments, including constant, widespread pain all

---

[2] Sanchez's original alleged onset date was amended to this date at the hearing based upon her work history. (Tr. 43).

over her body and chronic fatigue, (Tr. 364-65, 372), as well as difficulty understanding instructions, memory issues, and social anxiety. (Tr. 67-69). With regard to her mental impairments, the ALJ aptly summarized the longitudinal treatment records:

> The record establishes the claimant has a history of major depressive disorder and anxiety disorder. The claimant treated the conditions prior to the alleged onset date (Exhibit 1F). During the relevant period, the claimant continued to treat her conditions with the use of medication (Exhibit 15F at 19). Despite the presence of the conditions, treatment records from March 2020 note that the claimant's orientation, memory, attention, language, and fund of knowledge were normal and intact (Exhibit 3F at 11). Thereafter, treatment records note the claimant underwent a consultative examination in November 2020 (Exhibit 8F). At the time, the claimant reported difficulty falling and staying asleep, appetite fluctuations, dysphoric moods, crying spells, guilt, hopelessness, loss of interest in activities, irritability, fatigue, loss of energy, worthlessness, diminished self-esteem, concentration difficulties, diminished sense of pleasure, and social withdrawal (Exhibit 8F at 4). The claimant also reported anxiety-related symptoms that included excessive apprehension or worry, being easily fatigued, irritability, restlessness, difficulties concentrating, muscle tension, avoidance of social settings, ruminating and overthinking, and racing thoughts (Exhibit 8F at 4). In addition, she reported panic symptoms of heart palpitations, nausea, sweating, dizziness, trembling, and chest pain (Exhibit 8F at 5). During the visit, she also reported cognitive symptoms of short-term memory deficits, concentration difficulties, difficulty learning new material, organization difficulty, word findings deficits and planning difficulties (Exhibit 8F at 5). Notably, she reported that she had never been hospitalized for psychiatric treatment (Exhibit 8F at 3). On examination, the claimant was alert and oriented to person, place, and time, with a clear thought process and adequate speech (Exhibit 8F at 6). However, she had mildly impaired attention, concentration, and recent and remote memory skills (Exhibit 8F at 6).

4

The claimant reported similar symptoms during a consultative examination in April 2021 (Exhibit 10F). On examination, normal findings were again noted with regard to her appearance, speech, thought process, orientation, intellectual functioning, and judgment and insight (Exhibit 10F). However, she continued to maintain mildly impaired attention, concentration, and recent and remote memory (Exhibit 10F at 6). Thereafter, treatment records from June 2021 note that the claimant reported depression and worry, with thoughts of self-harm (Exhibit 13F at 31). On examination, she continued to have normal orientation, memory, attention, language, and fund of knowledge (Exhibit 13F at 32).

(Tr. 25-26).

As to the medical opinion evidence of Sanchez's mental abilities, the state agency psychological consultants Drs. Fink and Amanullah both agreed that Sanchez had moderate limitations in her ability to concentrate, persist, or maintain pace and Dr. Fink further opined that she was moderately limited in her ability to interact with others. (Tr. 93, 114). Consultative examiner Leah Bielski also opined that Sanchez had moderate limitations in mental functioning, including in her ability to understand, carry out, and make judgments on complex work-related decisions and interact with the public, supervisors, and coworkers, and respond appropriately to usual work situations and changes in routine work setting. (Tr. 647-48). Sanchez's treating provider, Dr. Kate Rogers, determined she had marked limitations in her ability to understand, remember, or apply information, concentrate, persist, or

maintain pace, and adapt or manage herself and moderate limitations in her ability to interact with others. (Tr. 1045).

Upon this backdrop, on October 29, 2021, the ALJ conducted a hearing in Sanchez's case at which Sanchez and a vocational expert testified. (Tr. 37-85). The ALJ posed hypothetical scenarios to the vocational expert, using a combination of the mental and physical limitations opined by the various medical experts to determine whether jobs existed in the national economy that Sanchez could perform. The first hypothetical proposed by the ALJ embraced the opinions of the state agency medical consultants that Sanchez was capable of light work, occasional postural maneuvering, and would be limited to tasks involving few if any variables with no more than frequent interaction with the public. Notably, this hypothetical contained no limitation to involving fast-paced production rate work. The vocational expert testified that an individual with that RFC would not be able to perform Sanchez's past work, and went on to identify occupations she could perform:

> ALJ: [The] first hypothetical I am going to pose today is the state agency opined that the claimant would be able to frequently lift and carry ten pounds, occasionally 20. Would be able to stand and/or walk approximately six hours in an eight hour work day, sit six hours in an eight hour work day, would be limited to occasional climbing ramps and stairs, climbing ladders, ropes, and scaffolds, balancing, stooping, kneeling, crouching, and crawling, so all the postural are occasional, would have environmental limitations in that she should avoid – or would be limited to no more than frequent exposure to cold temperature

6

extremes and vibration, and should avoid – or she could tolerate no more than frequent exposure to fumes, odors, dust, gases, chemicals, and moving machinery. . . . she would be able to understand, remember, and carry out tasks involving few if any variables, and no more than frequent interactions with the public.

. . .

ALJ: Is there other work that would fall within the residual functional capacity that I identified for an individual that would be a younger individual with a limited education?

VE: Yes. I have some very simple work that falls within this RFC. First would be cleaner, housekeeper, DOT 323.687-014, SVP 2, light. It was a GED of 1, 1, 1 so I know it's very simple, routine work, 400,000 national, and no environmental restrictions. The second is bakery worker, conveyor line, DOT 524.687-022, SVP 2, light, 230,000 national. And third would be small products assembler, DOT 706.684-022, SVP 2, light, 100,000 national.

ALJ: Any inconsistencies with the Dictionary of Occupational Titles or the Selected Characteristics of Occupations and the RFC that you gave?

. . .

VE: No.

(Tr. 77-78). Thus, the three occupations identified by the vocational expert, housekeeper, cleaner, bakery worker, conveyor line, and small parts assembler, were consistent with the proposed RFC which significantly did not include any limitations to no fast-paced production rate work.

7

The ALJ went on to propose a second hypothetical based upon the consultative examiner's opinion:

> ALJ: Okay. And then we have a consultative examiner opinion in the file that limits the claimant as follows . . . that limited her to frequent carrying of ten pounds and occasionally 50, so her lifting and carrying were separate with lifting being 20 and 50, or 20 and 100 and carrying being ten and 50, that the claimant would be able to sit for a total of five hours in an eight hour work day but only in four hour increments, that the claimant would be able to stand for three hours in a work day in three hour increments, or I'm sorry, two hour increments, and would be able to walk for two hours a day in one hour increments. Further that the individual would be limited to occasional postural as we discussed before in the prior one, this similarly where all those were occasional in this evaluation from the consultative examiner, could tolerate frequent exposure to moving mechanical parts, frequent operation of a motor vehicle . . . and limited her to a noise level of moderate . . . based upon that RFC as well as the psychological RFC at 8F which finds that the claimant would be limited to . . . the same tasks with understanding, remember, and carrying out tasks with few if any variables, would be able to tolerate no more than frequent interaction with the public, supervisors, and coworkers. And I would say as far as supervisors go, she could tolerate frequent interaction with her supervisor but would require no more than occasional supervision, *and would be able to tolerate frequent work setting process and tool changes but no fast paced production rate work.* Based upon that RFC would the claimant be able to perform her past work as actually performed?

> VE: Well, as actually performed the weight limit would be okay but then with the only being able to stand for three hours and two hours at a time and walk two hours and one hour at a time and the job was on their feet all day they cannot do their past jobs.

> ALJ: Okay. And how about those jobs that you gave for hypothetical one, would an individual with that residual functional capacity be able to perform the occupations you previously identified?

8

VE: Well, the bakery worker, conveyor line, and small products assembler have a sit/stand option, and someone that could sit five and stand three, and stand two hours at a time would fall within the sit/stand option requirements. And those two jobs accommodate that and in fact are almost always performed with someone sitting and standing because of the tedious nature of the work.

ALJ: Would they appear in the same numbers?

VE: They would – to me they would – it would appear in the same numbers because they're only – I mean like I said almost all the time performed sitting and standing because they're tedious.

. . .

ALJ: Is there another occupation that would also fall within this RFC?

VE: Well, with frequent interaction with the public which was what this – the psychological said she could just be a cashier II but the cashiers that sit and stand alternately . . . those cashiers are DOT 211.462-010, SVP 2, light, and 100,000 national. And that would fall within that psychological and physical requirements.

(Tr. 79-81).

Here, when the ALJ posed a second hypothetical RFC to the VE which included a limitation to no production rate pace work, the VE testified only that bakery worker, conveyor line, small products assembler, and cashier would be the occupations consistent with this RFC, focusing primarily on the necessity of a sit/stand option. However, the VE's testimony did not directly address the psychological limitations beyond interacting with the public. The VE's response to

9

the second hypothetical is particularly odd and anomalous, considering the limitation to no fast-paced production rate work, where the occupations of bakery worker, conveyor line, and small products assembler are conveyor line occupations which, by definition, require production rate pace. See 524.687-022 Bakery Worker, Conveyor Line, DICOT 524.687-022 ("Performs . . . tasks in preparation of cakes along *conveyor line*"); 706.684-022 Assembler, Small Products I, DICOT 706.684-022 ("Performs . . . repetitive tasks on assembly line to mass produce small products"). The ALJ did not further clarify whether these identified occupations allowed for all of the psychological limitations in the hypothetical RFC, despite these glaring inconsistencies. Moreover, the VE did not specifically identify cleaner, housekeeper, the only previously identified occupation which seemingly did not require fast-paced production rate pace work, in response to the second hypothetical, but added the new occupation of cashier.

In the ALJ's December 27, 2022, decision denying Sanchez's disability claim, the ALJ embraced this anomaly and concluded that Sanchez could perform the occupations of cleaner housekeeper, bakery worker conveyor line, and small products assembler, despite stating in her RFC that, "[t]he claimant cannot perform fast-paced production rate work." (Tr. 23-30). In that decision, the ALJ first concluded that Sanchez met the insured requirements of the Act through December

10

31, 2024, and had not engaged in substantial gainful activity since March 15, 2020, the alleged onset date. (Tr. 20).  At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Sanchez had the following severe impairments: degenerative disc disease of the lumbar spine, lumbar facet arthropathy, left hip osteoarthritis, obesity, major depressive disorder, and anxiety disorder. (Id.) At Step 3, the ALJ determined that Sanchez did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 21-23). With regard to her mental impairments, the ALJ concluded that Sanchez had moderate limitations in understanding, remembering, or applying information, concentrating, persisting, or maintaining pace, and adapting or managing oneself and mild limitations in interacting with others. (Id.)

Having made these findings, between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which accounted for these mild to moderate mental limitations, finding that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she may occasionally balance, stoop, kneel, crouch, crawl, and climb. The claimant can tolerate no more than frequent exposure to dust, fumes, odors, gases, chemicals, cold temperature extremes, vibration, and moving machinery. The claimant retains the mental capacity to

> understand, remember, or carry out tasks involving few if any variables. The claimant is able to tolerate frequent work setting, process & tool changes. The claimant is able to frequently work in coordination with others and can tolerate frequent interaction with others and requires no more than occasional supervision. *The claimant cannot perform fast-paced production rate work.*

(Tr. 28) (emphasis added). This RFC embraced the physical limitations of the first hypothetical proposed to the VE at the hearing, but added the psychological limitations defined by the second hypothetical, including limiting the plaintiff to no fast-paced production rate work. By conflating physical and mental elements of these two sets of hypotheticals the ALJ arrived at an RFC for Sanchez which said that she could not perform production rate work while finding that she could undertake what were undeniably production rate jobs. This anomaly remained unacknowledged and unaddressed in the ALJ's decision.

The ALJ then concluded at Step 4 of this sequential analysis that Sanchez could not perform her past work, (Tr. 28), but found at Step 5 that there were other jobs that existed in significant numbers in the national economy which Sanchez could perform. (Tr. 29-30). In reaching this conclusion the ALJ referenced the jobs identified by the vocational expert in response to the first hypothetical at the hearing, which did not include a limitation to no fast-paced production rate work, cleaner housekeeper, bakery worker conveyor line, and small parts assembler, stating that

"the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles," (Tr. 29), despite the VE not expressly identifying cleaner housekeeper as an occupation an individual with the mental limitations outlined in the RFC could perform and the DOT expressly indicating that the other two occupations are fast-paced production rate assembly line occupations.

This appeal followed. (Doc. 1). On appeal, Sanchez argues, *inter alia*, that the Commissioner did not meet his burden to establish a significant number of jobs since the occupations of cleaner housekeeper, bakery worker conveyor line, and small products assembler are inconsistent with the ALJ's restriction from performing fast-paced production rate work.  As discussed below, we agree that the ALJ failed to account for meaningful ambiguities and inconsistencies in the testimony of the vocational expert with regard to the occupations an individual with Sanchez's RFC could perform. Accordingly, we will remand this case for further consideration by the Commissioner.

III.    **Discussion**

A. **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ.**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence

standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

**B.** **The Role of the Vocational Expert and Dictionary of Occupational Titles in Disability Analysis.**

Oftentimes, as in this case, an ALJ turns to the testimony of a vocational expert based upon data drawn from the Dictionary of Occupational Titles to carry the Commissioner's burden at Step 5 to show that jobs exist in significant number in the national economy that the claimant can perform consistent her age, education, work experience and RFC. In this setting:

> Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert. The ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy.

16

Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005). When opining on this question, the vocational expert, in turn, "will generally consult the Dictionary of Occupational Titles (DOT), a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy, in order to determine whether any jobs exist that a claimant can perform." Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002).

The evidentiary value of this vocational expert testimony and reliance upon the Dictionary of Occupational Titles to carry the Commissioner's Step 5 burden of proof is directly a function of how accurately that testimony reflects economic reality. Recognizing this fact, the Dictionary of Occupational Titles catalogues a compendium of job titles, describing the responsibilities of myriad tasks, and assessing the physical, exertional, learning and language requirements for each of these jobs. And the purpose of the hypothetical questioning of the vocational expert is to reconcile the limitations in a claimant's RFC with the requirements of the jobs as described by the DOT. On this score, "vocational expert testimony may provide substantial evidence to support an ALJ's findings at Step 5." Evans v. Kijakazi, No. 1:21-CV-00554, 2023 WL 2761125, at *8 (M.D. Pa. Apr. 3, 2023) (citing Zirnsak, 777 F.3d at 616) ("The Commissioner can also rely on testimony from a VE to meet its step-five evidentiary burden"). But "[a] vocational expert's testimony is not

substantial evidence if the ALJ did not include in the hypothetical to the vocational expert all the claimant's credibly established impairments," <u>McMahon v. Kijakazi</u>, No. 1:20-CV-01320, 2022 WL 801505, at *4 (M.D. Pa. Mar. 15, 2022), and "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." <u>Podedworny v. Harris</u>, 745 F.2d 210, 218 (3d Cir. 1984).

Moreover, it is also well-settled that an ALJ may not allow inconsistencies between a claimant's actual skills, a vocational expert's testimony, and the criteria set forth in the Dictionary of Occupational Titles to go unaddressed and unresolved. Thus, the Third Circuit has long held that:

> To ensure consistency, courts have imposed an obligation on ALJs to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs ... and information in the [DOT]." <u>Id</u>. at *1; <u>Rutherford</u>, 399 F.3d at 556. Specifically, an ALJ is required to (1) ask, on the record, whether the VE's testimony is consistent with the DOT, (2) "elicit a reasonable explanation" where an inconsistency does appear, and (3) explain in its decision "how the conflict was resolved." <u>Burns v. Barnhart</u>, 312 F.3d 113, 127 (3d Cir.2002). An ALJ's failure to comply with these requirements may warrant remand in a particular case. <u>Rutherford</u>, 399 F.3d at 557.

Zirnsak, 777 F.3d at 617. Similarly, a remand is necessary if there are material ambiguities in the Vocational Expert's testimony that are not adequately addressed and resolved by the ALJ. Smith v. Astrue, 961 F. Supp. 2d 620, 658 (D. Del. 2013); Williams v. Barnhart, 424 F. Supp. 2d 796, 802 (E.D. Pa. 2006).

### C. **Substantial Evidence Review – the Role of this Court.**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v.

21

Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of

Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "Burnett does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to ALJ decisions, like the ruling in

this case, which rest upon unresolved inconsistencies between a vocational expert's

testimony and the skill requirements prescribed by the Dictionary of Occupational

Titles. When such inconsistencies exist, it is incumbent upon the ALJ to: (1) identify

the inconsistency; (2) address the inconsistency with the vocational expert; and (3)

resolve the inconsistency in the ALJ's decision. The failure to do so often compels

a remand. Zirnsak, 777 F.3d at 617.

**D.**    **This Case Will Be Remanded for Further Consideration of the Inconsistencies and Ambiguities in the Vocational Expert's Testimony.**

As we have noted, the ALJ's decision in this case rests upon both ambiguities with regard to precisely which occupations the vocational expert testified the plaintiff can perform despite her impairments and inconsistencies between the identified occupations, the RFC fashioned by the ALJ, and the Dictionary of Occupational Titles. Since the ALJ failed to address and resolve these material ambiguities and inconsistencies, the ALJ's reliance upon the VE's testimony is not supported by substantial evidence in this case.

For the plaintiff's part, Sanchez argues that none of the three occupations identified by the ALJ comport with the RFC requirement that she cannot perform fast-paced production rate work. We agree, in part, with this proposition, since two of the occupations identified by the ALJ in the decision, bakery worker conveyor line (DOT #524.687-022) and small products assembler (DOT #706.684-022), are clearly assembly line occupations. See 524.687-022 Bakery Worker, Conveyor Line, DICOT 524.687-022 ("Performs . . . tasks in preparation of cakes along *conveyor line*"); 706.684-022 Assembler, Small Products I, DICOT 706.684-022 ("Performs . . . repetitive tasks on *assembly line* to mass produce small products"). Indeed, ALJs, this Court, and others consistently equate, "production rate pace" with assembly line

23

work.[3] <u>Reed v. Saul</u>, No. 119CV01826JPWGBC, 2021 WL 3121484, at *7 (M.D. Pa. Mar. 12, 2021), <u>report and recommendation adopted,</u> No. 19-CV-01826, 2021 WL 3115190 (M.D. Pa. July 22, 2021) (Court and ALJ referred to production rate pace as assembly-line work); <u>Maxwell v. Kijakazi</u>, No. CV 22-4465, 2023 WL 3674335, at *3 (E.D. Pa. May 25, 2023) (same); <u>Baca v. Berryhill</u>, No. CV 16-246 WPL, 2017 WL 3267745, at *4 (D.N.M. July 31, 2017) ("'Production rate pace' is a commonly used term to refer to assembly line work"). Thus, clearly the testimony

---

[3] It is also worth noting that ALJs frequently clarify what is meant by "production rate pace" in hypotheticals posed to vocational experts by referencing assembly line work because other circuits have held that the term "production rate pace" is not "especially common—certainly not common enough for us to know what [the term] mean[s] without elaboration." <u>Angela S. v. Saul</u>, No. CV TJS-19-2849, 2021 WL 733373, at *3 (D. Md. Feb. 25, 2021) (quoting <u>Thomas v. Berryhill</u>, 916 F.3d 307, 312) (4th Cir. 2019)). Indeed, these circuits have found remand necessary based solely upon the failure to explain the meaning of a production rate pace in RFCs and hypotheticals to vocational experts, explaining that "we do not know what the ALJ intended when she used that phrase. As a result, it is difficult, if not impossible, to evaluate whether restricting [the claimant] to a 'non-production oriented work setting' properly accounted for [the claimant's] well-documented limitations in concentration, persistence, and pace." <u>Perry v. Berryhill</u>, 765 F. App'x 869, 872 (4th Cir. 2019) (citing <u>Thomas</u>, at 311-12; <u>Varga v. Colvin</u>, 794 F.3d 809, 815 (7th Cir. 2015) (ALJ's failure to define "fast paced production" made it impossible to "assess whether a person with [the claimant's] limitations could maintain the pace proposed")). This view further compounds our conclusion that the testimony of the vocational expert in this case is simply too unreliable to constitute substantial evidence.

of the VE that an individual who could not perform production rate pace positions could perform these assembly line positions was inconsistent with the DOT. The ALJ's decision then failed to (1) identify the inconsistency; (2) address the inconsistency with the vocational expert; and (3) resolve the inconsistency in the ALJ's decision, as the ALJ was required to do under governing Third Circuit standards. This failure of analysis, in turn, prejudiced the consideration of Sanchez's disability claim since the ALJ found that Sanchez could work in two occupations which do not comport with the limitations in her RFC. In this setting, the Commissioner cannot rely on the argument that "the VE . . . testified that there were no inconsistencies between his testimony and the DOT," (Doc. 16, at 21), where it is clear that the VE's testimony did not address the production rate pace limitation.

Nor can the ALJ's decision be salvaged by relying upon the remaining position, cleaner housekeeper, where the ALJ failed to resolve the patent ambiguity in the testimony of the VE with regard to this occupation. While we are unpersuaded by the plaintiff's argument, on this score, that a limitation to no production rate pace work alone necessarily precludes her from performing the job of cleaner housekeeper, see Beverly A. T. v. O'Malley, No. 23-CV-00050-SH, 2024 WL 1308039, at *3 (N.D. Okla. Mar. 27, 2024) (Finding no apparent conflict between RFC limiting to no production rate pace and cleaner housekeeper position); Sigmon

v. Berryhill, No. 5:17CV120-RJC-DSC, 2018 WL 4576788, at *4 (W.D.N.C. Apr.

5, 2018), report and recommendation adopted, No. 5:17-CV-120-RJC-DSC, 2018

WL 3738227 (W.D.N.C. Aug. 7, 2018) ("Nothing in the DOT suggests that the

office helper, inspector/packer or housekeeping cleaner jobs involve production pace

work akin to an assembly line"); Baca, 2017 WL 3267745, at *4 ("'Production rate

pace' is a commonly used term to refer to assembly line work, but does not refer to

goal-oriented tasks like being an office cleaner"), the ALJ erroneously stated that

the vocational expert's testimony supported the conclusion that an individual with

Sanchez's RFC could perform the requirements of the cleaner housekeeper

occupation. In fact, while the VE identified cleaner housekeeper as a position which

an individual with Sanchez's *physical* RFC could perform, when the ALJ

incorporated the additional mental limitations, including frequent interaction with

others, no more than occasional supervision, able to tolerate frequent work setting

process and tool changes but no fast paced production rate work, mental limitations

that were later incorporated into Sanchez's RFC, the vocational expert testified that

Sanchez would be able to perform the jobs of bakery worker conveyor line, small

products assembler, and cashier, but did not identify cleaner housekeeper as a

position which was congruent with these mental limitations. (Tr. 79-81).

Thus, we are presented with an administrative record that discloses a cascading array of unresolved conflicts between a vocational expert's testimony and the ALJ's findings, which is unexplained and unacknowledged by either the expert or the ALJ. Boone, 353 F.3d at 209; Minichino, 955 F.Supp.2d at 380. Further, in this case there are material ambiguities in the Vocational Expert's testimony that are not adequately addressed and resolved by the ALJ. Smith, 961 F.Supp.2d at 658; Williams, 424 F.Supp.2d at 802. These factors strongly suggest the need for further consideration and clarification regarding how the additional mental limitations incorporated into Sanchez's RFC may erode her employment prospects.

Simply put, more is needed here. It is axiomatic that the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. This means that there must be a logical nexus between the ALJ's factual findings and legal conclusion. That logical bridge is missing here. On the current record, where the hypothetical questioning of the Vocational Expert by the ALJ was inconsistent with the DOT and ambiguous and did not adequately address all the mental limitations in the resulting RFC, and those inconsistencies and ambiguities were not acknowledged, addressed, and resolved by the ALJ, the ALJ's burden of articulation is not met. Therefore, this matter will be remanded for further consideration by the Commissioner.

27

Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, this task should remain the duty and province of the ALJ on remand. Further, having found that a remand is justified on these grounds, we have not addressed any other claimed errors because the ALJ may in the first instance address them upon remand. See McMillan v. Comm'r of Soc. Sec., No. 16-313, 2018 WL 6617841, at *4 (D.N.J. Dec. 18, 2018) (holding the same in finding that a remand was appropriate because the ALJ failed to properly consider the plaintiff's severe obesity impairment at the third step and the fifth step, and thus the Court "need not consider Plaintiff's other arguments at this juncture"); see also Lawrence v. Colvin, No. 15-2851, 2016 WL 1644622, at *10 (D.N.J. Apr. 26, 2016) (holding the same in finding that a remand was appropriate because the ALJ failed to properly consider one of the claimant's disabilities, and thus the ALJ would be required to engage in an entirely new evaluation concerning the claimant's other alleged severe disabilities).

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED:    March  26, 2025